UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------------X
KATHERINE PRIESTLEY,

                                      Petitioner,                       13-cv-4755(PAE)

  -against-

PANMEDIX INC., PARMEDIX INC.
ELECTRONIC KNOWLEDGE PUBLISHING,
INC., COGNITION PHARMACEUTICALS, LLC
MCDONALD COMRIE, DAVID ERLANGER, PHILLIP
YEE, BALLON, STOLL, BADER & NADLER, PC,
HALKET WEITZ, CURTIS COMRIE, ROBERTA COMRIE,
MARY ERLANDER, DARIN KAPLAN, RICHARD PECK,
LINDA BIERER, TARA MACLEOD, MELVIN HELLER, JOHN
THEODORACOPULOS, ALEXIS THEODORACOPULOS,
STEPHANIE PARK, NICOLE KAPLAN, LITTLE ROCK, LTD,
TANYA KAUSHIK, MABEL TRUESDELL, RELIDE REALTY,
DENLOW PRIVATE TRUSTCO, LTD, and ROSS YOUNGMAN,

                                      Respondents.
------------------------------------------------------------------------------------X

# MEMORANDUM OF LAW IN OPPOSITION TO THE CROSS-MOTION FOR SUMMARY JUDGMENT FILED BY RESPONDENTS

**RUSS & RUSS, P.C.**
**Attorneys for Petitioner**
**543 Broadway**
**P.O. Box 149**
**Massapequa, New York 11758**
**(516) 541-1014**

## PRELIMINARY STATEMENT

This Memorandum of Law is submitted by Petitioner, Katherine Priestley ("Priestley"), in opposition to the cross-motion for summary judgment filed by Respondents.

It is undisputed that Panmedix, its principal, McDonald Comrie, and Panmedix's attorneys, Mr. Weitz and Mr. Yellen, devised the scheme to voluntarily give the alleged security interests to the friendly insider creditor group once they discovered that Priestley's UCC-1 filing was not extended so that they could argue that the friendly insider creditor group were bona fide purchasers for value whose alleged lien had priority over Priestley's security interest. They did not, however, consider that Priestley had a security interest by virtue of the Secured Note, whether or not there was also a security agreement (which there was), and whether or not there was a UCC-1 filing. In other words, they failed to appreciate that as an insider group, they could never perfect a security interest senior to that of Priestley, because Priestley did not require a UUCC-1 to be secured. As to the judgment debtor and insider group, she was secured under the Secured Note (and the security agreement).

However, Priestley emphasizes several other critical defects in Respondents' cross-motion for summary judgment. First, Respondents have not demonstrated by admissible evidence that the alleged security agreement in their favor was made in good faith, by both the transferor – Panmedix, the judgment debtor - and the alleged transferees, the creditor Respondents as a group. Second, the alleged security agreement was made by Panmedix to the insider group when it was insolvent. This group includes shareholders, officers (or former officers), investors and employees of Panmedix, siblings of Panmedix's principal officer and shareholder, McDonald Comrie, and Panmedix's two attorneys.

Panmedix's insolvency is obvious, admitted, and not in dispute: Panmedix claims (but does not prove by admissible evidence) that it owes the Respondent creditor group in excess of $12,131,363.22 (Ex. 74), including retroactively applied interest and a massive sum of counsel fees. Under DCL § 271:

> A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.

Respondents concede that the creditor Respondents are to be considered one group, acting in concert, for purposes of this Special Proceeding. Thus, the alleged security interests in their favor is constructively fraudulent, especially since McDonald Comrie, Ballon Stoll and Halket Weitz (Panmedix's principal officer and shareholder and attorneys, respectively), as well as the insiders who were or are officers, directors and/or shareholders, all had beforehand knowledge of Priestley's security interest at the time of the execution and perfection of the creditor Respondents' liens. The Secured Note states therein that it is recorded in the office of Panmedix. Finally, the entire transaction is infected with actual and constructive fraud in accordance with the Stipulated Facts and the admissions set forth in the deposition testimony of Respondents. This court may make a finding of fraud against Respondents though such a finding is not required for the denial of the cross-motion.

The cross-motion is built upon the fantasy and false premise that this dispute is a "race to the courthouse" (Respondents' MOL, page 3) between two creditor groups, each vying for the assets of a debtor. As this tall tale is spun by Respondents' counsel, Priestley "chose to sit on her hands and do nothing to enforce her judgment" (Respondents' MOL, page 2) and then "awoke from her slumber" (Respondents' MOL, pg 3) to find that the race had "already been won by the swifter party: the Respondents." (Respondents' MOL, page 3).

The unraveling of this story starts with the fact that there is no race at all between the Petitioner and the non-debtor Respondents. One of the stipulated facts is that Panmedix and McDonald Comrie "offered" the security agreement to Panmedix's insiders once Panmedix, Comrie and their lawyers discovered in 2009 that Priestley's UCC-1 had not been extended in 2006 (Stip. ¶26). The entire transaction was engineered by and for Panmedix, the judgment debtor, to avoid its obligations to Priestley. The judgment debtor, for itself, not for the creditor Respondents, is the real party in interest and stands in the shoes of the creditor Respondents in defense of this Special Proceeding.

It is beyond cavil that Mr. Weitz, counsel to the judgment debtor, took the first step to hatch the plan to avoid and frustrate Priestley's rights by giving a group of insiders an alleged security interest after he discovered that Priestley had not extended her UCC-1 filing. Mr. Weitz so informed McDonald Comrie who approved the scheme. Mr. Comrie then contacted each of the Respondents in the group in furtherance of the scheme, and "offered" the security interest to each of them, unsolicited. These insiders did not bargain for a security interest; they were instructed by McDonald Comrie to sign the security agreement, which they did. The evidence establishes that none of the creditor Respondents had ever demanded payment of their alleged debts, nor threatened or commenced legal action to enforce their alleged claims. Not a single one of them had conceived or demanded a security interest in Panmedix's property. Enforcement of most, if not all, of the alleged debts was time-barred by the six year Statute of Limitations at the time the alleged security interests were given. The application of retroactive interest to time-barred claims only underscores the conspiracy to construct massive adverse claims to that of Priestley. Mr. Weitz freely admits that he never even considered the merits of

their alleged claims when he prepared the security agreement. Their alleged claims are not set forth in the security agreement.

The "value" - the consideration - allegedly underpinning the security agreement is stated to be four (4) months of forbearance, which is an attorney's construct, not a real deal term, especially since at the time of the execution of the alleged security agreement, most, if not all, of the claims of the creditors were barred by the applicable statute of limitations set forth in CPLR 213. The cross-motion references alleged "enhanced" interest, which in plain English is the contrived concept that old time-barred promissory notes bear interest at a higher rate than set forth in the promissory notes. In their haste to create a cover story of "value" they forgot that the promissory notes could not be amended, retroactively, to include "enhance" interest without actually modifying or restating each promissory note.

Moreover, the so-called "plain vanilla" security agreement upon which the Respondents group relies, lacks a key and crucial element of consideration: <u>the reaffirmation of the alleged debts coupled with the debtor's waiver of the right to interpose the defense of statute of limitations.</u> The absence of any real consideration, along with the rest of this collusive transaction makes this is a sham transaction.

The judgment debtor and McDonald Comrie are spearheading this defense. The judgment debtor's attorneys represent both the judgment debtor and the alleged creditors. The creditor Respondents do not seek any relief against the judgment debtor; they do not want to "turnover" assets or the appointment of a receiver. Respondents' single unified answer, filed one day before the filing of summary judgment motions, has no claim for relief, except, obviously, to defeat Priestley for the benefit of the judgment debtor.

The Respondents label the security agreement in their favor as a group, a "rather uneventful, plain vanilla document" (Respondents' MOL, page 3). This document is actually diabolical and was invented by Mr. Weitz, counsel to the judgment debtor, and employed by Mr. Yellen, litigating counsel for the judgment debtor after failed negotiations to pay down Priestley's judgment and after <u>Judge Baer told Priestley's predecessor counsel that grounds for an attachment existed, but the preferred method is execution on the judgment debtor's assets.</u> Mr. Yellen used it to stop the New York City Marshall from levying on the assets of the judgment debtor by sending a threatening letter to the New York City Marshall with an unsigned copy of the Security Agreement by which Respondents claimed priority over Priestley. The fact that Mr. Yellen sent an unsigned copy to the City Marshall raises the question of whether the alleged dates of execution are real or sham.

Facing the annihilation of Panmedix, the judgment debtor, by levy/execution, Mr. Weitz, McDonald Comrie, and Mr. Yellen, teamed to frustrate and impair Priestley's rights, which existed both as a secured party under her Secured Note and Pledge SA (a security agreement) and as a judgment creditor and executing judgment creditor. They had and still have a pliable, controllable, and cooperative insider group, consisting of family members, officers, directors, counsel, stockholders and original investors, who they could and did manipulate so as to pretend that it was a real creditor group. They defined the alleged creditors as a group in the Security Agreement, because they are a unified group - not of creditors - but of participants, with Mr. Weitz, McDonald Comrie and Mr. Yellen, in deceit and fraud.

Despite these damning facts, Priestley has no need of proving constructive or actual fraud, although these facts scream out for such a finding. Priestley need not prove constructive or actual fraud to be successful. She only needs to establish her right of "turnover" and the ancillary

relief of receivership, and that her rights are superior to the right claimed by the Respondents group.

The cross-motion refers to a certain alleged SBA loan, an alleged subordination by Priestley and an alleged expired UCC-1 by the SBA. It is unclear what Respondents are arguing; is it that their claims are subordinate to the SBA? Is it that the SBA might be a party in this Special Proceeding?

In any event, by Comrie's own admission (Decl. ¶6) - and as set forth in Respondents' 56.1 Statement (¶21) - the SBA's alleged lien embraces furniture, fixtures, hardware and equipment, only. The SBA's lien does not secure Panmedix's patents, judgments and intellectual property. Only Priestley has a valid and subsisting lien on those assets.

As set forth in the original Memorandum of Law filed by Priestley, she was not required to join the SBA in this proceeding, or any other alleged claimant against the assets of the judgment debtor. However, in the exercise of caution, Priestley is serving the moving papers (without Exhibits) on the SBA by traceable Priority Mail and will confirm that the SBA receives them. At the time of oral argument, we will report to the Court as to any response by the SBA. Furthermore, the document whereby Priestley allegedly subordinated to the SBA has not been produced. Finally, the SBA loan seems to be in a small sum, in comparison to Priestley's judgment and claim and is now further reduced by payments, with ongoing payments (because SBA loans are usually personally guaranteed).[1]

## DEPOSITIONS OF OTHER RESPONDENTS

Priestley submits that the security agreement and the alleged security interests of the creditor respondents were gratuitous, a sham, and not a real transaction at all. In Priestley's

---

[1] According to Exhibit 72, the balance due to the SBA is approximately $89,000.

memorandum of law in support of the motion for summary judgment, we cited and quoted from eleven (11) depositions from the creditor Respondents which demonstrate that the security agreement as to those creditors was given without demand and was completely unsolicited. We refer to depositions of other creditor Respondents herein.

David Erlanger (Ex. 53) loaned money to Panmedix (Stip. ¶57). He testified that he never sought to enforce his claims: "Well I've never sought collection. I never tried to get them (Panmedix) to write me a check because they never made much money." (page 14; line 5-7). At page 42 of his transcript, Dr. Erlanger testified that he does not know what a security interest is, but believed that he signed a document "…affirming the monies that were owed to me, if that's what you are referring to" (page 44; line 22-24), and did not know what a forbearance agreement was (page 45; line 3-10).

Alexis Theodoracopulos (Ex. 56) claimed to be owed deferred compensation and is the owner of shares of stock in Panmedix (Stip. ¶ 51). He also never took any actions to collect his money (page 8; line18-23).

Little Rock was examined under oath (Ex. 54). Its loan of $250,000 was evidenced by a promissory note made on August 28, 2002, which was to be repaid in one year (Stip.¶ 49). Little Rock admitted that Panmedix never requested Little Rock to forebear on enforcement after the loan came due. (page 11; line 16 – page 12; line 11).

Stephanie Park (Ex. 60) and Mabel Truesdell (Ex. 66) were also examined under oath. Neither of them sought to enforce their alleged claims or threatened litigation prior to the execution of the security agreement.

## RESPONDENTS DID NOT ACT IN GOOD FAITH

Respondents have not demonstrated by admissible evidence the good faith of both the transferor and transferees. The cross-motion states: "Respondents have provided evidence that the transfer of the security interest was made in good faith, without intent to defraud, for the fair consideration of forbearance of debt collection in exchange for the security interests." (Respondents' MOL, page 8). There is no such evidence of "good faith". Respondents also seek to obfuscate by stating: "Good faith is an elusive concept under the DCL." (Respondents' MOL, pages 12, 13). This is a false premise. "Good faith" under the UCC and the Debtor and Creditor Law ("DCL") is not an "elusive concept"; it is a defined and well-settled concept which goes hand-in-hand with the concept of fair consideration.

Fair consideration under DCL § 272 "is not only a matter of whether the amount given for the transferred property was a 'fair equivalent' or 'not disproportionately small,' which the parties vigorously dispute, but whether the transaction is made 'in good faith,' an obligation that is imposed on both the transferor and the transferee…" Sardis v. Frankel, 113 A.D.3d 135, 978 N.Y.S.2d 135 (1st Dept., 2014) (citations omitted).

The relationship between "fair consideration" and "good faith" is set forth in the DCL. DCL § 272 states:

> Fair consideration is given for property, or obligation,
>
> a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or
>
> b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

"Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement. New York UCC 1-203. The UCC upon which Respondents are relying in their

portrayal of this dispute as a race between two creditor groups, where one has perfected by filing, and where the other has failed to extend a filing, includes the concept of good faith. In the absence of good faith, the creditor Respondents group does not have any argument that they possess a valid perfected security interest.

The obverse of good faith is bad faith. When a party acts in bad faith, such party is ordinarily denied the benefit of any provision or concept that would improve his position; acting in bad faith is a disqualifying factor. Super Glue Corp v Avis Rent a Car Systems, Inc., 132 A.D.2d 604, 517 N.Y.S.2d 764 (2nd Dept., 1987). Here, Respondents suffer from their inability and abject failure to establish the good faith of the transferor and transferees, but also the palpable bad faith on their part.

As the Second Circuit stated in Orr v. Kinderhill Corp., 991 F.2d 31 (2d Cir., 1993):

In equity, "substance will not give way to form, [and] technical considerations will not prevent substantial justice from being done." Pepper v. Litton, 308 U.S. 295, 305, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939); see also Dean v. Davis, 242 U.S. 438, 443, 37 S.Ct. 130, 131, 61 L.Ed. 419 (1917); Warren v. Union Bank of Rochester, 157 N.Y. 259, 270-71, 51 N.E. 1036, 1039 (1898). **Thus, an allegedly fraudulent conveyance must be evaluated in context; "[w]here a transfer is only a step in a general plan, the plan 'must be viewed as a whole with all its composite implications.'"** Pereira v. Checkmate Communications Co. (In re Checkmate Stereo & Elec., Ltd.), 9 B.R. 585, 612 (Bankr.E.D.N.Y.1981) (quoting Buffum v. Peter Barceloux Co., 289 U.S. 227, 232, 53 S.Ct. 539, 541, 77 L.Ed. 1140 (1933)), aff'd, 21 B.R. 402 (E.D.N.Y.1982); accord Yoder v. T.E.L. Leasing, Inc. ( In re Suburban Motor Freight, Inc.), 124 B.R. 984, 998 (Bankr.S.D.Ohio 1990); Gafco, Inc. v. H.D.S. Mercantile Corp., 47 Misc.2d 661, 664-65, 263 N.Y.S.2d 109, 114 (N.Y.Civ.Ct.1965); Gruenebaum v. Lissauer, 185 Misc. 718, 728, 57 N.Y.S.2d 137, 145 (Sup.Ct.N.Y.County 1945), aff'd, 270 A.D. 836, 61 N.Y.S.2d 372 (1st Dept.1946).
(Emphasis added)

In context, the alleged security interest was based on sham and illusory consideration. None of the creditor Respondents in the group sought or demanded a security interest.

Forbearance was a sham consideration as was the increased interest rate. None of the creditors sought or demanded forbearance or additional interest.

The cross-motion cites to Bankruptcy Court cases of dubious applicability. If the Court considers such authority, then the court should also consider the doctrine established in the Bankruptcy setting of equitable subordination. "The purpose of equitable subordination is to undo wrongdoing by an individual creditor in the interests of the other creditors." Official Comm. of Unsecured Creditors of Applied Theory Corp. v. Halifax Fund, L.P. (In re AppliedTheory Corp.), 345 B.R. 56, 59 (S.D.N.Y., 2006). The judge-made doctrine of equitable subordination predates Congress's revision of the Code in 1978, relying on earlier cases, such as In re Mobile Steel Co., 563 F. 2d 692, 700 (5th Cir., 1977), in which the Court observed that the application of the doctrine was generally triggered by a showing that the creditor had engaged in "some type of inequitable conduct." Mobile Steel discussed two further conditions relating to the application of the doctrine: that the misconduct have "resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant," and that the subordination "not be inconsistent with the provisions of the Bankruptcy Act."

The cross-motion cites to the important decision of the Second Circuit in Pashaian v. Eccelston Props., 88 F.3d 77 (2d Cir., 1996). In Pashaian, the Court summarized the situation as follows: "When [Pashaian] commenced discovery in aid of his efforts to collect the judgment, he learned that Landesman and Douglas had, through a series of transactions, stripped [Properties and Leasing] of all [their] valuable assets and placed them in trusts for the benefit of themselves and their families." Pashaian v. Eccleston Properties, Ltd. 1995 WL 168893 at 1 (S.D.N.Y., 1995). The Court found, as a matter of law, that the transfers were fraudulent as to plaintiff regardless of actual intent under New York DCL §§273 and 273 (a). In addition, the Court found

that the facts set forth above support the conclusion that there was "actual intent to hinder, delay or defraud present or future creditors" so that those transactions were also fraudulent under section 276.

Pashaian involved the satisfaction of a pre-existing debt as fair consideration for a transfer of property. The Second Circuit stated the general rule that "at least where no actual intent to hinder, delay, or defraud creditors has been shown, even the preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance." HBE Leasing Corp. v. Frank, 48 F.3d 623, 634 (2d Cir., 1995). However, the Second Circuit noted that New York courts have carved out one exception to the rule that preferential payments of pre-existing obligations are not fraudulent conveyances: preferences to a debtor corporation's shareholders, officers, or directors are deemed not to be transfers for fair consideration. See Farm Stores, Inc. v. School Feeding Corp., 102 A.D.2d 249, 477 N.Y.S.2d 374, 378 (2nd Dept., 1984), aff'd, 64 N.Y.2d 1065, 489 N.Y.S.2d 877, (1985); Southern Industries, Inc. v. Jeremias, 66 A.D.2d 178, 411 N.Y.S.2d 945, 949 (2nd Dept., 1978). HBE Leasing Corp., 48 F.3d at 634-35; Atlanta Shipping Corp. v. Chemical Bank, 818 F.2d 240, 249 (2nd Cir., 1987) ("In general, repayment of an antecedent debt constitutes fair consideration unless the transferee is an officer, director, or major shareholder of the transferor."); Laco X-Ray Sys., Inc. v. Fingerhut, 88 A.D.2d 425, 433, 453 N.Y.S.2d 757, 762 (2nd Dept., 1982) (fair consideration lacking when assets of corporation "were conveyed in such a manner that its principals became preferred creditors to the detriment of other creditors"), appeal dismissed, 58 N.Y.2d 606, 447 N.E.2d 86, 460 N.Y.S.2d 1026 (1983); Julien J. Studley, Inc. v Lefrak, 66 A.D.2d 208, 215, 412 N.Y.S.2d 901, 906 (2nd Dept.), aff'd, 48 N.Y.2d 954, 425 N.Y.S.2d 65 (1979). (dominant stockholder of corporation could not "withdraw the capital of the corporation, or prefer himself as a creditor").

Thus, the Second Circuit reiterated that New York law would not allow the transfer to qualify as "fair consideration" Section 273 of the DCL. Furthermore, a cause of action under Section 276 "may lie even where fair consideration was paid and where the debtor remains solvent." Grumman Aerospace Corp. v. Rice, 199 A.D.2d 365, 366, 605 N.Y.S.2d 305, 307 (2nd Dept., 1993); see also ACLI Gov't Sec., Inc. v. Rhoades, 653 F.Supp. 1388, 1395 n. 32 (S.D.N.Y., 1987) aff'd, 842 F.2d 1287 (2d Cir, 1988) ("[I]f other circumstances warrant a finding of fraudulent intent, the conveyance may be found fraudulent even if it was based on fair consideration, or if the debtor remained solvent after the conveyance.") (citations omitted); De West Realty Corp. v. IRS, 418 F. Supp. 1274, 1279 (S.D.N.Y., 1976) ("'Actual intent to hinder, delay, or defraud either present or future creditors' is sufficient to render conveyances fraudulent, and even 'fair consideration' cannot save conveyances made under the circumstances proscribed by Section 276."); Elliott v. Elliott, 365 F. Supp. 450, 454 (S.D.N.Y., 1973) (where intent to hinder, delay, or defraud creditors is shown, "the conveyance is fraudulent even though the grantor is solvent, and even if he receives fair and adequate consideration.") (citations omitted); United States v. 58th St. Plaza Theatre, Inc., 287 F. Supp. 475, 498 (S.D.N.Y., 1968). ("Even 'fair consideration' cannot save conveyances made under the circumstances proscribed by Section 276.").

Respondent's reliance on Pashaian is misplaced because it destroys Respondent's claim of "fair consideration." There is no fair consideration to the preferential treatment of insiders by insiders to the detriment of Priestley.

The focus on the specific transfers confirms that Panmedix received nothing in exchange for its gratuitous agreement to subject its property to the creditor Respondents' group alleged security agreement. None of the creditor Respondents had threatened to or actually commenced

litigation. Most of the claims were time-barred in any event. The alleged security agreement was not legally required, not made in good faith and was not supported by fair consideration. The security agreement should be set aside.

## CONCLUSION

Priestley has superior rights to those alleged by the non-judgment debtor Respondents. Priestley is a secured creditor with a valid security interest by virtue of her Secured Note and security agreement. Accordingly, Priestley's motion for summary judgment should be granted, Respondents' cross-motion for summary judgment should be denied and a judgment should be entered:

    a.    Granting "turnover" of the Patents and Assets, as defined in the Petition, in favor of Priestley;

    b.    Directing the U.S. Marshal to levy upon the Patents and Assets of Panmedix, EKP and Cognition, a garnishee, in favor of Priestley;

    c.    Pursuant to CPLR Article 52 appointing a Receiver as to Panmedix and EKP;

    d.    Directing Panmedix, EKP and Cognition to "turnover" and deliver the papers, documents and title to U.S. patents and patent applications to the U.S. Marshal, or Receiver, or Priestley;

    e.    Adjudicating and determining adverse claims asserted by Respondents in favor of Priestley;

    f.    Adjudicating and determining that Priestley has superior rights to those of the Respondents by virtue of the Note, Patent SA, or alternatively, as executing judgment creditor, or alternatively that the alleged interests of the Respondent are null, void and/or fraudulent;

g. Assuring the complete and proper documentation and transfer of the data, database, test results and software of Panmedix and EKP, without limitation;

h. Awarding Priestley fees and costs against each of the Respondent; and

i. Granting to Priestley such additional and other relief as to the Court seems just and proper, together with the costs and disbursement hereof.

Dated: February 19, 2013

Respectfully Submitted,

RUSS & RUSS, P.C.

By: Jay Edmond Russ (JR2258)
Attorney for Petitioner
543 Broadway
Massapequa, NY 11758
516-541-1014
jayruss@russrusspc.com