UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

KATHERINE PRIESTLEY,

                              Petitioner,

          -v-

PANMEDIX INC.; PARMEDIX INC.; ELECTRONIC
KNOWLEDGE PUBLISHING, INC.; COGNITION
PHARMACEUTICALS, LLC; MCDONALD COMRIE;
DAVID ERLANGER; PHILLIP YEE; BALLON, STOLL,
BADER & NADLER, PC; HALKET WEITZ LLP;
CURTIS COMRIE; ROBERTA COMRIE; MARY
ERLANGER; DARIN KAPLAN; RICHARD PECK;
LINDA BIERER; TARA MACLEOD; MELVIN
HELLER; JOHN THEODORACOPULOS; ALEXIS
THEODORACOPULOS; STEPHANIE PARK; NICOLE
KAPLAN; LITTLE ROCK, LTD.; TANYA KAUSHIK;
MABEL TRUESDELL; RELIDE REALTY CO.;
DENLOW PRIVATE TRUSTCO, LTD.; and ROSS
YOUNGMAN,

                          Respondents.

------------------------------------------------------------------------X

13 Civ. 4755 (PAE)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/1/2014

PAUL A. ENGELMAYER, District Judge:

    Katherine Priestley, a judgment creditor of Panmedix, Inc. ("Panmedix"), seeks in this

lawsuit to set aside as fraudulent a "Security Agreement" that Panmedix entered into with a

group of its creditors (the "Respondent Creditors"),[1] which if not set aside would be superior to

---

[1] The Respondent Creditors are the 20 creditors of Panmedix who signed the Security Agreement
with Panmedix: specifically, Little Rock, Ltd.; John Theodoracopulos; Alexis Theodoracopulos;
Curtis Comrie; Relide Realty Co.; Tanya Kaushik; Stephanie Park; Phillip Yee; David Erlanger;
Mary Erlanger; Linda Bierer; Richard Peck; Darin and Nicole Kaplan; Tara Macleod; McDonald
Comrie; Melvin Heller; Roberta Comrie; Mabel Truesdell; Halket Weitz LLP; and Ballon Stoll
Bader & Nadler, P.C. *See* Dkt. 36 ¶¶ 4, 49–68. They are all named as Respondents in this
action. Two Respondent Creditors, Mary Erlanger and Linda Bierer, produced documents but

1

Priestley's own security interest in certain assets of Panmedix.  The Respondent Creditors who benefit under the Security Agreement include officers, directors, large shareholders, and prominent affiliates of Panmedix.  Priestley and the respondents now cross-move for summary judgment.  For the reasons that follow, the Court holds that Respondents' Security Agreement is a fraudulent conveyance within the meaning of New York Debtor and Creditor Law ("DCL") §§ 273-a and 276.  Priestley's motion for summary judgment is therefore granted and the respondents' motion for summary judgment is denied.

## I.    Background[2]

This case concerns the priority as between two sets of creditors who assert that they have a security interest in assets belonging to Panmedix, a company in financial distress.  All parties agree that the case turns on whether the "Security Agreement" that Panmedix signed with the Respondent Creditors in 2009 constitutes a fraudulent conveyance under New York law, such that it must be set aside in determining which creditors have priority.

---

were unable to be deposed in this action.  *Id.* ¶ 48.  They have stated that they wish to "withdraw their claims from consideration of this motion," *id.*; however, in light of the Court's ruling that the Security Agreement is, categorically, a fraudulent conveyance, these two respondents are bound by the ruling.  The remaining respondents are as follows:  Panmedix and Electronic Publishing, Inc. ("EKP"), the judgment debtors; Parmedix Inc., which is a typographical error— the intended entity, Panmedix Inc., is already sued; Ross Youngman, a creditor who did not sign the security agreement; and Cognition Pharmaceuticals, Inc. ("Cognition"), a judgment debtor of Panmedix.  *Id.* ¶¶ 29, 47.  Youngman and Cognition are not represented by counsel in this action, *id.* ¶ 47, though they were served by certified mail, *see* Dkt. 7.  The parties agree that Cognition is in default in this action, *see* Stip. ¶ 42, although no Certificate of Default has yet been applied for or issued.

[2] The Court's account of the facts is derived from the parties' Joint Statement of Stipulated Facts, Dkt. 36 ("Stip."), Joint Exhibit Binder, Dkt. 53 ("Ex."), and from other documents as cited.

A.      **Panmedix**

Panmedix is a Delaware corporation whose principal place of business is in New York

City.  Stip. ¶ 1.  Its president and CEO is McDonald Comrie ("Comrie").  *Id.*  Panmedix has been

in operation since 1995.

Panmedix is in the business of selling or licensing to others various forms of cognitive

tests.  *Id.* ¶ 7.  Panmedix offers four products: (1) the "customized research tool," used largely by

drug companies to measure certain domains of the brain, such as memory; (2) the "concussion

resolution index," used to measure sports concussions; (3) the "cognitive stability index," which

measures cognitive performance broadly; and (4) the "CST," a cognitive test designed for

patients who have, or are likely to have, dementia.  Ex. 51 ("Comrie Dep. I") at 42–44.[3]   The

tests underlying three of these products were developed by Dr. David Erlanger of Headminder,

Inc. ("Headminder"); Headminder licensed the tests to Panmedix, which developed the code to

administer the tests on a computer and which sells the resulting products.  *Id.* at 73, 77; Ex. 53

("Erlanger Dep.") at 10–11, 22.

Panmedix has never been profitable.  Comrie Dep. I at 49.  It has survived by borrowing

money, cutting staff, deferring payments on its debts, and receiving influxes of funds from its

President and CEO, McDonald Comrie.  *Id.* at 53; Stip. ¶ 17.

B.      **Priestley's Loan and Initial Enforcement Actions Against Panmedix**

On April 6, 2001, Priestley loaned Panmedix $750,000, at an interest rate of 11.5%,

pursuant to a Senior Secured Promissory Note and a Patent Security Agreement.  Stip. ¶¶ 8–9;

Ex. 6–7.  The loan was to mature a year later.  Ex. 6 at 1.  In the Senior Secured Promissory

Note, Panmedix granted Priestley a security interest in "all of its . . . personal property of every

---

[3] Exhibit 51 includes two separate depositions of McDonald Comrie, which are separately
paginated.  The Court refers to them as "Comrie Dep. I" and "Comrie Dep. II."

kind and nature," including accounts, patents, copyrights, and data. *Id.* ¶ 5.1. The Patent Security Agreement separately granted Priestley a security interest in all of Panmedix's patents and contained certain representations and commitments regarding those patents. Ex. 7. On April 9, 2001, Priestley recorded her security interests by filing a UCC Financing Statement, also known as a UCC-1. Stip. ¶ 10; Ex. 8; *see also* N.Y. U.C.C. Law § 9-310.

Beginning in late 2001, Panmedix ceased to pay its creditors and employees the full amounts they were due. Stip. ¶ 17. It also did not pay Headminder the license fees it was owed; in fact, Panmedix was never paid Headminder any license fees. *Id.*; Erlanger Dep. 13–16.

By March 2005, Panmedix had ceased repaying Priestley on its loan. *Id.* ¶ 14. On April 9, 2006, Priestley's UCC-1 expired. *See* Ex. 8; N.Y. U.C.C. Law § 9-515 ("a filed financing statement is effective for a period of five years after the date of filing"). Priestley did not renew her UCC-1. Stip. ¶ 15.

On February 23, 2007, Priestley brought suit in this District to recover on her loan to Panmedix. *Id.* ¶ 16; *Priestley v. Comrie*, No. 07 Civ. 1361 (S.D.N.Y.). On August 28, 2008, Hon. Harold A. Baer entered judgment for Priestley in the amount of $1,603,716.51 against Comrie, Phillip Yee, David Erlanger, Panmedix, EKP, and Headminder (the "Judgment"). Stip. ¶ 20; *Priestley*, No. 07 Civ. 1361, Dkt. 69. The Judgment was later amended to eliminate as judgment debtors Comrie, Yee, Erlanger, and Headminder, leaving only Panmedix and EKP. Stip. ¶ 31; *Priestley*, No. 07 Civ. 1361, Dkts. 91, 94.

At the time, Panmedix was financially unable to pay the Judgment. Ex. 13. The parties therefore engaged in extensive negotiations. *Id.* The result was that, on December 4, 2008, Priestley and Panmedix signed an agreement, which contemplated that Panmedix would be receiving funds from the sale of a company, and possibly from other transactions as well, and

4

that these funds would be paid to Priestley to satisfy the Judgment.  *Id.*; Stip. ¶ 21.  However, as matters turned out, the company was not sold and the other transactions did not occur.  Ex. 13. Priestley therefore received no payments towards the Judgment.  *Id.*

On May 29, 2009, Priestley wrote to Judge Baer, informing him of these developments and asking him to issue an order of attachment.  *Id.*  In a memo endorsement on Priestley's letter, issued on June 9, 2009, Judge Baer responded that, although "it would seem that the requirements for an attachment are all there," it would be faster to "take your judgment to the Marshal and levy on the assets."  *Id.*

Priestley currently owns 18.87% of Panmedix's shares.  Ex. 46.

### C.    The Security Agreement with the Respondent Creditors

In July 2009, Panmedix's counsel, Theodore M. Weitz, Esq., of Halket Weitz LLP, discovered that Priestley's UCC-1 had expired and not been renewed:

> I went to the New York State Secretary of State's website, and we examined what liens existed against Panmedix.  The only liens that I was able to find was a lien filed with some type of typographical errors by Katherine Priestley [and one] on a roughly similar date by the Small Business Administration.  Both of those ha[d] expired after five years under the Uniform Commercial Code, and not have been renewed.
>
> I went to the U.S. Patent Office and looked for liens that were filed.  Again, there were liens against the patents filed by Ms. Priestl[e]y.  I believe those – I'd also concluded had expired.  And I may have misspoken about the spelling errors.  I believe the spelling errors were probably in the patent office lien, and not in the state lien, but I'm not certain.
>
> I also looked at the Uniform Check Credit, which governs liens, and I also looked at the security agreement of Ms. Priestl[e]y, or between Ms. Priestl[e]y and Panmedix.

Ex. 67 ("Weitz Dep.") 31–32; *see also* Stip. ¶ 24.  Weitz informed Comrie that Priestley's UCC-1 had expired.  Stip. ¶ 25.

Apparently concluding that the failure to renew Priestley's UCC-1 created an opening to create a security agreement that might take priority over Priestley's, Panmedix's CEO, Comrie, then directed Weitz to prepare a security agreement between Panmedix and certain of its creditors, as well as UCC-1s recording the security interests that would be created pursuant to that agreement.  *Id.*  The creditors included an investment fund; individual investors; current and former employees, some of whom were also shareholders; two law firms; Panmedix's landlord; David Erlanger, the founder of Headminder, and his mother; Panmedix's two officers and directors, Phillip Yee and Comrie himself; and three of Comrie's siblings, who had lent money and/or were owed backpay.  *Id.* ¶¶ 49–68.  The claims that these persons or entities had against Panmedix derived from either loans, backpay, attorneys' fees, and/or unpaid rent.  *Id.* ¶ 47.  *See generally* Table 1, *infra*.

During August 2009, "Comrie spoke to each intended beneficiary and offered them a security interest against Panmedix."  Stip. ¶ 26.  Comrie prepared UCC-1s for the future signers of the Security Agreement; between August 23 and August 28, 2009, either he or Halket Weitz, LLP filed the UCC-1s.  *Id.* ¶ 28; Comrie Dep. I at 134.  Each UCC-1 listed Comrie as the filer and stated that an acknowledgment should be sent to Panmedix.  Ex. 14.  On August 25, 2009, Comrie signed the Security Agreement on Panmedix's behalf.  Ex. 2 ("Security Agreement").  Between August 25 and September 4, 2009, the 20 Respondent Creditors signed the Security Agreement.[4]  *Id.*

The Security Agreement recites that "the Creditors have extended credit to the Company which the Company has failed to pay in a timely manner," that "the Creditors have forborne from commencing any action to recover sums owed to them by the Company and are willing to

---

[4] Fifteen of the Respondent Creditors put dates alongside their signatures; these ranged from August 25 to September 4, 2009.  Stip. ¶ 27.  Five did not date their signatures.  *Id.*

continue to forbear until January 1, 2010," and that "the Creditors have requested and the Company is willing to grant a security interest in the assets of the Company in order to secure the payment of such obligations." *Id.* at 1.  The Security Agreement further recites that the Creditors agreed, as consideration, to forbear on their claims until January 1, 2010, *i.e.*, for about four months.  *Id.*; *id.* ¶ 3(b).  Panmedix agreed, as consideration, to grant

> jointly and severally to the Creditors a security interest in all of the following property now owned or at any time hereafter acquired by the Company or in which the Company now has or at any time in the future may acquire any right, title or interest . . . (i) all General Intangibles; (ii) all tangible personal property of any kind; (iii) all real property and interests in real property; and (iv) to the extent not otherwise included, all [p]roceeds and products of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing.

*Id.* ¶ 2.  In the Security Agreement, Panmedix also granted each Creditor a 13% interest rate on debts due to the Creditor, unless the Creditor's prior agreement provided for a higher rate.  *Id.* ¶ 13.  The agreement further provided that, "[t]o the extent that this Agreement requires or permits any action or waiver by the Creditors, or the parties wish to amend this Agreement, or the Creditors wish to grant a power of attorney to one or more persons to act on their behalf, action may be taken by the Creditors and shall be binding on all the Creditors by a majority vote, with each Creditor entitled to that number of votes equal to the dollar amounts of principal owed to such Creditor by the Company as of the close of the month prior to the vote."  *Id.* ¶ 12.

The Table below lists the 20 Respondent Creditors, and, as to each, the amount of their debt purportedly secured by the agreement, the basis for that debt, and their relationship with Panmedix.

**Table 1.  The Respondent Creditors.**

| Name | Debt Secured (Principal Only) | Basis for Debt | Relationship (Other than Creditor) |
|---|---|---|---|
| Halket Weitz LLP | $1,398,004 | Legal fees | Outside counsel |
| McDonald Comrie | $1,080,454 | Back pay ($777,500), loans ($302,954) | Officer, Director, & Shareholder (41.28%) |
| Curtis Comrie | $740,770 | Back pay ($592,100), loans ($148,670) | McDonald Comrie's Brother; Employee; Shareholder (7.67%) |
| Phillip Yee | $631,800 | Back pay ($594,850), loans ($36,950) | Officer, Director, & Shareholder (12.78%) |
| Tanya Kaushik | $270,600 | Back pay | Employee; Shareholder (0.97%) |
| Little Rock, Ltd. | $250,000 | Loan | None |
| Melvin Heller | $175,000 | Loans | Principal of Landlord |
| Ballon Stoll Bader & Nadler, P.C. | $105,058 | Legal fees | Outside counsel |
| Alexis Theodoracopulos | $101,350 | Back pay | Former Employee; Shareholder (0.97%) |
| Relide Realty Co. | $69,788 | Back rent | Landlord |
| David Erlanger | $51,200 | Loans | CEO of Headminder |
| John Theodoracopulos | $35,000 | Loan | Shareholder (1.12%) |
| Linda Bierer | $30,000 | Loan | None |
| Richard Peck | $30,000 | Loan | Shareholder (1.12%) |
| Darin and Nicole Kaplan | $30,000 | Loans | Former Director; Shareholder (6.74%) |
| Mabel Truesdell | $30,000 | Loan | Best friend of the Comries' late mother |
| Roberta Comrie | $29,000 | Loans | McDonald Comrie's sister; Shareholder (0.74%) |
| Mary Erlanger | $24,500 | Loan | David Erlanger's mother |
| Stephanie Park | $9,600 | Back pay | Employee (formerly full-time, currently part-time) |
| Tara MacLeod | $3,280 | Loan | McDonald Comrie's sister |
| **Total Debt Secured** | $5,095,404 | | |
| *Of which held by Shareholders* | $2,948,974 (57.88%) | | |
| *Of which held by Outside Counsel* | $1,503,062 (29.50%) | | |
| *Of which held by Shareholders or Outside Counsel* | $4,452,036 (87.37%) | | |

*Sources:* Stip. ¶¶ 49–68; Ex. 28; Ex. 32; Comrie Dep. I at 76, 132; Ex. 66 ("Truesdell Dep.") at 7.

**D.      Priestley Continues to Attempt to Enforce the Judgment**

On October 5, 2009, Priestley docketed the Judgment in New York Supreme Court, New York County.  Stip. ¶ 30; Ex. 15.  On December 3, 2009, Priestley delivered an execution on the Judgment to the New York City Marshal, who announced that he would hold a public sale of Panmedix's assets.  Stip. ¶¶ 32–33; Ex. 17.  However, on December 11, 2009, that sale was halted, after counsel for Panmedix wrote a letter notifying the Marshall that "substantially all of the assets of PanMedix, Inc. have been pledged pursuant to [a] Security Agreement dated August 24, 2009 to the scheduled Secured Creditors," who "assert a lien superior to judgment creditor Katherine Priestley."  Ex. 1; *see also* Stip. ¶¶ 34–35.

**E.      Priestley Files the State Court Action**

On April 12, 2011, Priestley, through previous counsel, brought an action in New York Supreme Court against a group of defendants, including most respondents herein, alleging that the Security Agreement was a fraudulent conveyance under the DCL, and seeking damages and declaratory relief (the "State Court Action").  Stip. ¶ 36; Ex. 18.  That action is pending.  Stip. ¶ 37; Ex. 19.  Discovery is complete in that action.

**F.      The Instant Action**

On July 10, 2013, Priestley, represented by new counsel, brought this action, alleging that the Security Agreement was a fraudulent conveyance, and seeking to satisfy the Judgment through a turnover of and levy upon the patents and assets of Panmedix, EKP, and Cognition. Dkt. 1 ("Pet.").  She also seeks the appointment of a receiver.  *Id.*  On July 16, 2013, the case was assigned to this Court.  On July 17, 2013, Hon. Jed S. Rakoff, sitting in Part I, issued an Order to Show Cause, directing Respondents to show cause why the Court should not grant Priestley her requested relief.  Dkt. 5.  On August 7, 2013, in response, Respondents moved to

9

stay this action as duplicative of the State Court Action; the parties then briefed the issue.  Dkts.

9–15.  On September 13, 2013, the Court declined to stay the proceedings, in part because this

action did not require any discovery independent of that which had been taken in the state action,

and also in recognition that Priestley was seeking to protect a prior judgment obtained in this

court.  Dkt. 16; Dkt. 18 at 32.  On November 25, 2013, the Court set a briefing schedule for the

parties' cross motions for summary judgment.  Dkt. 33.

On January 30, 2014, the parties submitted a joint statement of stipulated facts.  Dkt. 36.

On February 5, 2014, the parties cross-moved for summary judgment, Dkts. 40, 42, and Priestley

filed an accompanying memorandum of law, Dkt. 44 ("Pl. Br.").  On February 6, 2014,

respondents filed their opening memorandum of law.  Dkt. 50 ("Def. Br.").  On February 10 and

14, 2014, the parties filed their joint set of exhibits.  Dkts. 51–53.  On February 19, 2014, the

parties filed their replies.  Dkt. 54 ("Pl. Reply Br."); Dkt. 56 ("Def. Reply Br.").

On February 24, 2014, the Court granted Priestley's request to submit a supplemental

brief addressing respondents' jurisdictional argument, which respondents had first raised in their

reply brief.  Dkt. 58.  On February 26, 2014, Priestley submitted that supplemental brief.  Dkt. 59

("Pl. Jur. Br.").  On March 5, 2014, the Court held argument.  Dkt. 63 ("Tr.").

On March 12, 2014, respondents submitted a declaration from Comrie, attaching two

exhibits, which the declaration states are subsequent amendments to the Security Agreement,

extending the period of forbearance.  Dkt. 61.  On March 16, 2014, Priestley objected to this

filing as late, unauthorized, and including exhibits not produced during discovery.  Dkt. 62.

## II.    Applicable Legal Standards

To prevail on a motion for summary judgment, the movant must "show[] that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)).

### III.    Subject Matter Jurisdiction

"Under the doctrine of ancillary jurisdiction, a federal court may exercise jurisdiction over a claim for which no subject matter jurisdiction independently obtains if the claim is sufficiently related to an initial claim properly before the court."  *Chesley v. Union Carbide Corp.*, 927 F.2d 60, 64 (2d Cir. 1991).  "The decision to hear an ancillary claim is discretionary, however, and turns upon whether the policies of 'judicial economy, convenience, and fairness to litigants' are furthered by the assumption of jurisdiction."  *Id.* (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966)).  "Ancillary enforcement jurisdiction is, at its core, a creature

11

of necessity," requiring "extraordinary circumstances." *Peacock v. Thomas*, 516 U.S. 349, 359 (1996).  Accordingly, the Supreme Court has "cautioned against the exercise of jurisdiction over proceedings that are entirely new and original, or where the relief sought is of a different kind or on a different principle than that of the prior decree." *Id.* at 358 (citations omitted).

 The law is clear, and the parties do not dispute, that this Court, in the service of enforcing the earlier Judgment issued by Judge Baer, has ancillary jurisdiction over the core of this action, which calls upon it to resolve Priestley's claim that the Security Agreement was a fraudulent conveyance.  *See Epperson v. Entm't Express, Inc.*, 242 F.3d 100, 104–107 (2d Cir. 2001) (action to void an allegedly fraudulent conveyance by a judgment debtor fell within federal district court's ancillary jurisdiction to enforce its own judgments so long as the action runs against the original judgment debtor, and does not seek to impose liability for that judgment on a new party); *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 295 F. Supp. 2d 366, 376 (S.D.N.Y. 2003) ("In *Epperson*, the Court of Appeals found that a fraudulent conveyance action did fall within the district court's ancillary jurisdiction, despite the Supreme Court's holding in *Peacock*, because the action is one to enforce a judgment rather than to impose a new liability on a third party.").

 Respondents, however, assert that this Court lacks ancillary jurisdiction over a subset of the claims here: Priestley's demand for attorneys' fees against the Respondent Creditors, who are not among the parties liable under the original Judgment issued by Judge Baer.  *See* Def. Reply Br. at 14; Pet. ¶¶ 80, 82(h).  As respondents note, the Supreme Court has suggested that ancillary jurisdiction may not extend this far:  "We have never authorized the exercise of ancillary jurisdiction in a subsequent lawsuit to impose an obligation to pay an existing federal judgment on a person not already liable for that judgment."  *Peacock*, 516 U.S. at 357.  Priestley counters

that because DCL § 276-a explicitly provides for an award of attorneys' fees in cases of actual fraud, an award of fees and costs to the beneficiary transferees of a fraudulent conveyance is "incidental to the Court's power under the Debtor and Creditor Law to set aside fraudulent transfers." Pl. Jur. Br. at 4.

The Court has not found dispositive case law as to whether its ancillary enforcement jurisdiction over a fraudulent conveyance case brought under DCL § 276 extends to determining whether transferees of the fraudulent conveyance who were not liable under the original Judgment (nor parties to that original action) are liable for attorneys' fees under DCL § 276-a. The Court is skeptical that its ancillary jurisdiction reaches this far. *Peacock* suggests otherwise, as granting an award of fees against the transferees would extend monetary liability against new parties, on a theory not raised in the original action. *See Peacock*, 516 U.S. at 358–59.

The Court need not, however, decide that question here. Even if the Court concluded that it had authority to order the Respondent Creditors who were not parties to the lawsuit that led to the original Judgment to pay Priestley's legal fees, it would not exercise its discretion to do so. Judicial economy weighs against such an exercise of ancillary jurisdiction. A determination of the Respondent Creditors' liability as to legal fees would require the Court to determine, as to each of the 20 Respondent Creditors, whether they acted with intent to defraud Priestley. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991) ("before awarding attorneys' fees against a defendant, whether he be the debtor or the transferee, the court must make an explicit finding of actual intent to defraud; imputed fraud does not satisfy § 276–a."). That is potentially quite a substantial undertaking. It might entail expanded discovery; even if not, in the event of material disputes of fact as to the intent of one or more Respondent Creditors, there would be a need to make credibility determinations, based on live testimony, as to respondents' intent. By contrast,

13

resolution of the merits of Priestley's actual fraud claim— the heart of this matter—will require the Court to determine only whether the transferor, Panmedix, acted with fraudulent intent. This is a far more streamlined inquiry. *See In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005) ("To prove actual fraud under § 276, a creditor must show intent to defraud on the part of the transferor. Where actual intent to defraud creditors is proven, the conveyance will be set aside regardless of the adequacy of consideration given.") (citations omitted). The Court's declination to order the Respondent Creditors to pay Priestley's legal fees here does not, of course, preclude (1) the Court from ordering Panmedix to pay such fees, as Panmedix was party to the original Judgment and was the driving force behind the Security Agreement at issue; or (2) Priestley, should Panmedix be unable to pay these fees, from bringing action for such fees in state court against the Respondent Creditors.

Accordingly, the Court declines to exercise ancillary jurisdiction over the claim for attorneys' fees against the Respondent Creditors. The Court otherwise has, and chooses to exercise, ancillary jurisdiction over Priestley's fraudulent conveyance claims.

## IV.   Discussion

The parties agree that there are no disputed issues of material fact and the Court can, and should, resolve this fraudulent conveyance action on summary judgment. Tr. 5–8. The parties also agree that New York law concerning the enforcement of money judgments governs this action: Under Federal Rule of Civil Procedure 69(a), judgment creditors may use any execution method consistent with the practice and procedure of the State in which the district court sits. *See, e.g.*, *Eitzen Bulk A/S v. Ashapura Minechem, Ltd.*, 632 F.3d 53, 55 n.2 (2d Cir. 2011) (state procedural rules apply to the execution of federal money judgments based on Rule 69(a)(1));

*Mishcon de Reya New York LLP v. Grail Semiconductor, Inc.*, No. 11 Civ. 4971 (JMF), 2012 WL 5512240, at *1 (S.D.N.Y. Nov. 13, 2012).

Under New York law, "where it is shown that the judgment debtor is in possession or custody of money or other personal property in which he has an interest, the court shall order that the judgment debtor pay the money, or . . . deliver any other personal property, . . . to a designated sheriff."  N.Y. C.P.L.R. § 5225(a).  New York law similarly provides for the turnover of money or property held by another person in which the judgment debtor has an interest, N.Y. N.Y. C.P.L.R. § 5225(b), and for the turnover of debts owed to the judgment debtor by another person, N.Y. C.P.L.R. § 5227.  As to fraudulent conveyances, "Debtor and Creditor Law § 278 provides that a fraudulent conveyance may be set aside on behalf of a creditor whose claim has matured 'as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase.'"  *Sardis v. Frankel*, 978 N.Y.S.2d 135, 140 (1st Dep't 2014) (quoting DCL § 278).

Here, Priestley seeks a turnover order against the judgment debtors, *i.e.*, Panmedix and EKP, and against Cognition, a judgment debtor of Panmedix.  Respondents assert that they have a security interest in Panmedix's assets that is superior to Priestley's security interest, by virtue of the Security Agreement, which was executed after Priestley's UCC-1 had expired and before she had perfected the Judgment.  Priestley argues that the Security Agreement running to the benefit of the Respondent Creditors should be set aside because it was both a constructive and an actual fraudulent conveyance.

### A.    Constructive Fraudulent Conveyance

New York law "'identifies several situations involving 'constructive fraud,' in which a transfer made without fair consideration constitutes a fraudulent conveyance, regardless of the

intent of the transferor.'"  *In re Sharp*, 403 F.3d at 53 (quoting *HBE Leasing Corp. v. Frank*, 48

F.3d 623, 633 (2d Cir. 1995) ("*HBE Leasing I*").  Relevant here, a conveyance by a debtor is

deemed constructively fraudulent under DCL § 273-a if (1) it is "made without fair

consideration"; (2) "the person making it is a defendant in an action for money damages or a

judgment in such an action has been docketed against him"; and (3) "after final judgment for the

plaintiff, the defendant fails to satisfy the judgment."  DCL § 273-a.[5]

Panmedix has stipulated to facts satisfying the second and third prongs of the test:  At the

time Panmedix executed the Security Agreement, the Judgment had been entered against it, and

to this day, no part of the Judgment has been paid to Priestley.  Stip. ¶¶ 19–20.  Accordingly, the

dispositive question is whether the Security Agreement was made without "fair consideration."

If so, it cannot take priority over Priestley's interest.[6]

DCL § 272 defines "fair consideration" as follows:

Fair consideration is given for property, or obligation,

---

[5] DCL § 273-a provides that: "Every conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment."

[6] Priestley separately contends that the Security Agreement was a fraudulent conveyance under DCL § 273.  That statute requires her to establish both fair consideration *and* that the transferor was insolvent or would be rendered insolvent by the transaction.  *See* DCL § 273.  The Court has no occasion to resolve that claim, because doing so would require, for no good reason, resolution of an extra element (insolvency) beyond those required under § 273-a.  The first element (fair consideration) is the same as Priestley must establish under § 273-a; given the stipulated facts, no other elements of § 273-a are in dispute.  In any event, the factual record would prevent the Court from resolving at summary judgment the second element under § 273 – insolvency.  A person is insolvent when "the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured."  DCL § 271.  But the record is unclear whether Panmedix was insolvent, because it does not establish the value of Panmedix's assets at the time of the Security Agreement.

     a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

     b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

Applying this test, the Second Circuit has stated that "[t]he fair consideration test 'is profitably analyzed as follows: (1) the recipient of the debtor's property must either (a) convey property in exchange or (b) discharge an antecedent debt in exchange; and (2) such exchange must be a 'fair equivalent' of the property received; and (3) such exchange must be 'in good faith.'" *In re Sharp*, 403 F.3d at 53 (quoting *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1058–59 (2d Cir. 1995) ("*HBE Leasing II*")); *accord Sardis*, 978 N.Y.S.2d at 141 ("'Fair consideration' under Debtor and Creditor Law § 272 is not only a matter of whether the amount given for the transferred property was a 'fair equivalent' or 'not disproportionately small,' . . . but whether the transaction is made 'in good faith.'").  The requirement of good faith "is imposed on both the transferor and the transferee." *Sardis*, 978 N.Y.S.2d at 141.

     Here, the Court holds, for two independent reasons, that the Security Agreement lacked fair consideration.  First, Panmedix did not receive a fair equivalent in value for the property it pledged.  Second, the Security Agreement gave preferential treatment to shareholders.

     **1.**     **The Benefit Panmedix Received was Disproportionately Small to the Property it Pledged**

     The Security Agreement lacked fair consideration because the benefit that Panmedix received from its creditors—solely four months' forbearance—was not a "fair equivalent" and was "disproportionately small" to the valuable security rights that Panmedix relinquished.

     First, the contractual forbearance period was only four months.  Respondents have not adduced any evidence that Panmedix faced a liquidity crunch or similar problem during that

period such that the four-month extension served materially to assist Panmedix.  The benefit

Panmedix obtained from its creditors' forbearance was *de minimis*.  It was not a fair equivalent

to the significant value of the security interest that Panmedix chose to convey, which consisted of

a security interest in all of Panmedix's present *and future* assets.  *See* Security Agreement ¶ 2

(pledging "a security interest in all of the following property now owned or at any time hereafter

acquired by the Company or in which the Company now has or at any time in the future may

acquire any right, title or interest . . . (i) all General Intangibles; (ii) all tangible personal property

of any kind; (iii) all real property and interests in real property; and (iv) to the extent not

otherwise included, all [p]roceeds and products of any and all of the foregoing and all collateral

security and guarantees given by any person with respect to any of the foregoing").  Respondents

observe that the Security Agreement was later amended to extend the period of forbearance.  *See*

Dkt. 61.  But that is of no moment.  These later acts cannot be transported back in time to

rehabilitate the original Security Agreement as of the moment Panmedix chose to enter into it.

Second, significantly, few if any of Panmedix's creditors were seeking repayment from

it.  In adopting the Security Agreement, Panmedix could not, therefore, have reasonably believed

that the four-month forbearance term would provide it *any* practical benefit.  *See United States v.

McCombs*, 30 F.3d 310, 326 (2d Cir. 1994) ("[W]hat constitutes fair consideration under section

272 must be determined upon the facts and circumstances of each particular case.") (citations

omitted); *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) ("In equity, 'substance will not

give way to form, [and] technical considerations will not prevent substantial justice from being

done.'  Thus, an allegedly fraudulent conveyance must be evaluated in context.") (quoting

*Pepper v. Litton*, 308 U.S. 295, 305 (1939)).  Notably, Panmedix's corporate counsel testified

that, to his knowledge, no Respondent Creditor had threatened Panmedix, or taken legal action

against it, with regard to their potential monetary claims against Panmedix.  Weitz Dep. 33.

CEO Comrie testified that "a couple of people" had called him to ask for security; however, he

was unable to recall any specifics about those calls, which "might have" occurred in June or July

2009, and he acknowledged that one such creditor "might have" been his sister, Tara MacLeod,

who, he later recalled, did threaten to sue Panmedix.  Comrie Dep. I at 123–128; Comrie Dep. II

at 80–81 ("People were unhappy, but you can't get blood out of a stone.").  MacLeod, in any

event, was not a large creditor of Panmedix:  In 2009, she was owed $3,280 in principal and

$88,000 in interest.  Stip. ¶ 62; Ex. 64 ("Macleod Dep.") 7–8.

It is, therefore, not plausible that the entire Security Agreement, running to Priestley's

detriment in relation to all 20 Respondent Creditors, was entered into, or necessary, to satisfy or

forestall her demands.  Quite the contrary, a number of creditors testified that they had never

demanded payment or threatened litigation.  *See* Erlanger Dep. 14–15; Ex. 55 ("John

Theodoracopulos Dep.") at 10; Ex. 56 ("Alexis Theodoracopulos Dep.") at 8; Ex. 58 ("Heller

Dep.") at 8–9, 12; Ex. 62 ("Peck Dep.") at 13; Ex. 63 ("Kaplan Dep.") at 13; Ex. 65 ("Roberta

Comrie Dep.") at 12; Ex. 66 ("Truesdell Dep.") at 7.  Even the evidence of demands proffered by

Respondents is minimal.  *See* Dkt. 41 ("Comrie Decl.") ¶ 8; ("The employees wished to

memorialize their prior debt and establish a policy for payment going forward."); *id.* ¶ 11

("Among the various creditors of PanMedix, my two sister are, after Ms. Priestley, the most

difficult of creditors.  They, along with the attorneys and landlord, were the creditors that pushed

hardest for re-payment."); Ex. 68 ("Yellen Dep.") at 17 (litigation counsel for Panmedix

indicating that he made a phone call in the summer of 2009 requesting or demanding payment of

outstanding legal bills).  Similarly, the creditors did not appear to view themselves as giving up

anything of value when they entered into the Security Agreement.  They signed the agreement

with minimal discussion; and no creditor appears to have bargained with Panmedix concerning the terms of the Security Agreement. *See* Pl. Br. 9–12 (citing depositions).

In sum, in context, there is no reason to believe that Panmedix had any bona fide business reason to enter into the Security Agreement. The Security Agreement instead advantaged the Respondent Creditors relative to Panmedix's longtime nemesis Priestley. The nominal benefit Panmedix received from the agreement—four months' forbearance—was so miniscule, and so practically unnecessary, that it cannot credibly be said that Panmedix received consideration that was a "fair equivalent" of or "not disproportionately small" relative to the security it pledged.

Attempting to salvage the agreement, respondents argue that the provision of the Security Agreement providing for "majority rule" decisionmaking among the creditors, ¶ 12, constitutes adequate consideration. This benefited Panmedix, respondents imply, because the Respondent Creditors thereby limited their ability to make single claims against Panmedix, and instead "agreed to act in unison until one of them determines to 'break rank' in which case they must do so in writing." Def. Br. 4; *see also* Tr. 32 ("[A]ll those creditors on that list agreed to act in unison until they chose not to, in which case the whole thing would fall apart, which means that creditors could be paid ratably."). Panmedix, however, does not accurately read the Security Agreement. The majority-vote provision does not prohibit a creditor from acting singly against Panmedix to redeem its interest. Instead, it provides that the creditors may act collectively, in a manner that binds all others, by majority vote. *See* Security Agreement ¶ 12 ("[A]ction may be taken by the Creditors and shall be binding on all the Creditors by a majority vote."). And, because the Security Agreement grants the security interest to the Creditors "jointly *and severally,*" *id.* ¶ 2 (emphasis added), a creditor does not appear to be inhibited from acting individually to redeem his security interest. Of course, under the agreement, it is possible for a

majority of creditors to use ¶ 12 to block that creditor from redeeming his security interest, by amending the Agreement to extend the period of forbearance. *See, e.g.*, Dkt. 61 Exs. 77–78 (amendments to the Security Agreement extending the period of forbearance).  But the fact that a majority of Respondent Creditors have the ability to act to block others from foreclosing individually on Panmedix's asserts is not a benefit granted by the Respondent Creditors *to Panmedix*.  It exists to empower the Respondent Creditors to protect themselves against individual redemptions of security interests where such redemptions might redound to the detriment of the Respondent Creditors (*e.g.*, where the overall security interests available were unavailable to cover Panmedix's debts to all such creditors).  The provision, however, would benefit Panmedix only if a majority of creditors had promised Panmedix that they would use their power under the majority-rule provision to protect Panmedix against foreclosure by other creditors.  And in such a collusive scenario, the Security Agreement would be void for lack of good faith.  *See Sardis*, 978 N.Y.S.2d at 142 ("Good faith 'is lacking where there is a failure to deal honestly, fairly, and openly.'") (quoting *Berner Trucking, Inc. v. Brown*, 722 N.Y.S.2d 656, 658 (4th Dep't 2001)).  In sum, the majority-rule provision does not supply the "fair equivalent" consideration necessary to sustain the Security Agreement's grant of a security interest in favor of the Respondent Creditors.

### 2. The Security Agreement Gave Preferential Treatment to a Controlling Group of Shareholders

The Security Agreement between Panmedix and the Respondent Creditors is, separately, void for lack of good faith, because it gave preferential treatment to a controlling group of Panmedix shareholders.

"In the context of determining fair consideration under § 273, the general rule is that the satisfaction of a preexisting debt qualifies as fair consideration for a transfer of property, and that

'at least where no actual intent to hinder, delay, or defraud creditors has been shown . . . even the preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance.'" *Pashaian v. Eccelston Properties, Ltd.*, 88 F.3d 77, 85–86 (2d Cir. 1996) (quoting *HBE Leasing I,* 48 F.3d at 634).  However, "'New York courts have carved out one exception to the rule that preferential payments of pre-existing obligations are not fraudulent conveyances: preferences to a debtor corporation's shareholders, officers, or directors are deemed not to be transfers for fair consideration.'"  *Id.* at 86 (quoting *HBE Leasing I,* 48 F.3d at 634); *see In re Sharp*, 403 F.3d at 54 (no fair consideration when "'the transferee is an officer, director, or major shareholder of the transferor'") (quoting *Atlanta Shipping Corp., Inc. v. Chem. Bank*, 818 F.2d 240, 249 (2d Cir. 1987)).  This issue bears on the element of good faith.  *In re Sharp*, 403 F.3d at 54.

The Security Agreement gave preferential treatment regarding Panmedix's pre-existing obligations to the Respondent Creditors, who together own 73.39% of Panmedix's shares, by granting them security interests in Panmedix's assets superior to that of another creditor, Priestley (herself a shareholder, owning 18.87% of Panmedix's shares).  *See* Stip. ¶¶ 49–68; Ex. 46.  It therefore lacks good faith.  *Farm Stores, Inc. v. School Feeding Corp.*, 477 N.Y.S.2d 374, 378 (2nd Dep't 1984), *aff'd*, 64 N.Y.2d 1065 (1985) ("[P]referential transfers to directors, officers and shareholders of insolvent corporations in derogation of the rights of general creditors do not fulfill the good faith requirement of the Debtor and Creditor Law."); *Indus., Inc. v. Jeremias*, 411 N.Y.S.2d 945, 949 (2nd Dep't 1978) ("[T]he instant transfer must be deemed void for lack of good faith because it was consummated with the intent to obtain an unconscionable advantage for one, who is an officer, director and major stockholder of the corporation over the rights of other general creditors.").

To be sure, not all respondent creditors are shareholders of Panmedix; several are not. But the inclusion of some non-shareholders among the preferred group does not inoculate Panmedix's preferential treatment of a controlling group of its shareholders. Otherwise, insiders and controlling shareholders would be able to evade the restrictions on preferential treatment of shareholders by structuring a preferential arrangement to nominally benefit selected outside creditors. The Second Circuit's instruction to take a holistic approach to assessing conveyances claimed to be fraudulent is apposite here: "In equity, 'substance will not give way to form, [and] technical considerations will not prevent substantial justice from being done.' Thus, an allegedly fraudulent conveyance must be evaluated in context; where a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications." *Orr*, 991 F.2d at 35 (quoting *Pepper*, 308 U.S. at 305); *cf. HBE Leasing I*, 48 F.3d at 635 ("It is well established that multilateral transactions may under appropriate circumstances be 'collapsed' and treated as phases of a single transaction for analysis under the UFCA [New York Uniform Fraudulent Conveyances Act]."). Conceivably, there may be circumstances where the benefit to the group of shareholder-creditors is trifling compared to the benefit conferred upon the group of non-shareholder creditors, such that the transaction is fairly viewed as principally concerning these outsiders, with only incidental benefit to the controlling entities. But that is not the case here. Panmedix's shareholder-creditors held 57.88% of the principal secured by the Security Agreement, and Panmedix's outside counsel held an additional 29.50% of the secured principal, such that almost 90% of the secured principal was held by either shareholders or the company's outside counsel. *See* Table 1, *supra* (calculations based on Stip. ¶¶ 49–68). Further, 33.60% of the principal secured by the agreement was owed to Panmedix's two largest shareholders, Comrie and Yee, who are also Panmedix's only officers and directors and, between the two of

them, form a controlling bloc, with 41.28% and 12.78% of Panmedix's shares, respectively.  *Id.*; Stip. ¶¶ 56, 63; Comrie Dep. II at 5.

As the foregoing statistics underscore, the Security Agreement fails for lack of good faith.  Viewed as a whole, it serves to benefit corporate directors, shareholders, and insiders, to the detriment of creditor Priestley.

### B.    Actual Fraud

The Security Agreement is also voidable as a conveyance based on actual fraud.  The actual fraud provision of the DCL provides that "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."  DCL § 276.  Fraud is thereby broadly defined to include an "actual intent to hinder, delay, or defraud."  *Id.*; *see also In re Sharp*, 403 F.3d at 56.  A showing of actual fraud "does not require proof of unfair consideration or insolvency."  *Wall St. Assoc. v. Brodsky*, 684 N.Y.S.2d 244, 247 (1st Dep't 1999); *accord In re Sharp*, 403 F.3d at 56; *Pashaian*, 88 F.3d at 86 ("Actual intent to hinder, delay, or defraud either present or future creditors is sufficient to render conveyances fraudulent, and even 'fair consideration' cannot save conveyances made under the circumstances proscribed by Section 276.") (citations omitted).

"'Due to the difficulty of proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on 'badges of fraud' to support his case, *i.e.*, circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent.'"  *In re Sharp*, 403 F.3d at 56 (quoting *Wall St. Associates*, 684 N.Y.S.2d at 247). "Among such circumstances are: [1] a close relationship between the parties to the alleged fraudulent transaction; [2] a questionable transfer not in the usual course of business; [3] inadequacy of the consideration; [4] the transferor's knowledge of the creditor's claim and

the inability to pay it; and [5] retention of control of the property by the transferor after the conveyance." *Wall St. Assoc.*, 684 N.Y.S.2d at 248.

This case is brimming with badges of fraud. First, as noted, the parties to the Security Agreement are closely related. Fifty-eight percent of the principal secured by the agreement was owed to Panmedix's shareholders, of which 33.60% was owed to CEO McDonald Comrie and Board Secretary Phillip Yee, the company's sole officers and directors, who also constituted a majority of shareholders; an additional 15.17% was owed to Comrie's siblings; and another 9.10% was owed to other shareholders. In addition, 29.50% was owed to outside legal counsel, and most of that, 27.44%, was owed to the firm that drafted the Security Agreement, Halket Weitz LLP. *See* Weitz Dep. 17. Second, the transfer was unusual, in that Panmedix pledged as security all of its present and future assets. *See* Security Agreement ¶ 2. Third, the forbearance period of four months was clearly inadequate consideration for this extremely broad grant of security. Fourth, Panmedix was well aware of Priestley's claim, as it was represented by counsel in the litigation concerning her claim, and it was also aware of its inability to pay her, as a year had elapsed since the Judgment was rendered, and in that year Panmedix had paid nothing. Finally, Panmedix retained the control of its pledged assets after the transfer, and appears to retain them to this day.

The chronology of events, in fact, compellingly supports the conclusion that Panmedix entered the security agreement not as a bona fide response to the demands of its creditors, but as part of a plan "to hinder [or] delay" Priestley. Priestley had given Panmedix its largest loan, $750,000, and she was the only creditor pursuing litigation to obtain repayment. Ex. 6; Stip. ¶¶ 49–68; Section IV.A.1, *supra*. In July 2009, Weitz, outside counsel for Panmedix, engaged in a detailed search to determine if her security interest was still good, checking with the New York

25

Secretary of State, the U.S. Patent Office, and the "Uniform Check Credit." Weitz Dep. 31–32; Stip. ¶ 24. CEO Comrie then directed Weitz to prepare the Security Agreement, and he reached out to the creditors and "offered" them the Security Agreement. Stip. ¶¶ 25–26. The creditors signed the agreement without negotiation. *See* Pl. Br. 9–11 (citing depositions). The creditors' UCC-1s were prepared by Comrie and filed by either Comrie or Halket Weitz, LLP, Panmedix's outside counsel; the filings stated that the acknowledgements should be sent to Panmedix, not the individual creditors. *See* Comrie Dep. I at 134; Ex. 14. From start to finish, the agreement was thus the brainchild of Panmedix, apparently hatched for the benefit of Panmedix and its insiders and close affiliates, and to the detriment of its major creditor, Priestley. These circumstances strongly suggest that the Security Agreement was entered into opportunistically, to displace Priestley's priority claim on the pledged assets, after Comrie became aware of her failure to make the UCC-1 filing.

In one respect, this is an unusual fraudulent conveyance case. In the paradigmatic such case, a debtor corporation denudes the company of assets by giving them away to preferred insiders or creditors, frustrating the rightful demands of other creditors. Here, in contrast, the debtor corporation's intent in displacing the rightful creditor was, apparently, to keep operating, because the creditor's claim was upon the corporation's few remaining productive assets (*e.g.*, its patents). To do this, the company sought to place the claims of its insider-creditors (its officers and directors, their relatives, and outside counsel) ahead of that creditor, with the aim perhaps of blocking the creditor from taking those assets and thereby fortifying the company, rather than enriching these insider-creditors. But the law equally forbids such a conveyance as fraudulent. Petitioner Priestley has provided overwhelming indicia of fraud, and the respondents have failed utterly to demonstrable a bona fide purpose for the Security Agreement, other than to block and

hinder Priestley from getting at corporate assets to which she was lawfully entitled.  The Security Agreement is, therefore, a fraudulent conveyance within the meaning of DCL § 276.

## CONCLUSION

For the foregoing reasons, the Court holds that Respondents' Security Agreement is a fraudulent conveyance under DCL §§ 273-a and 276.  Priestley's motion for summary judgment is granted; respondents' motion for summary judgment is denied.  The Clerk of Court is respectfully directed to terminate all motions currently pending in this case.

The Court directs the parties to meet and confer and, by May 12, 2014, to submit a joint letter to the Court, setting forth their views as to the remedies that the Court should order, consistent with this decision.

SO ORDERED.

_Paul A. Engelmayer_
Paul A. Engelmayer
United States District Judge

Dated: May 1, 2014
       New York, New York